IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | |
|---|---|
| Jeffrey Mador, | : |
| *Plaintiff,* | : |
| v. | : Case No. 6:24-CV-146-REW |
| Armscor Precision International and Armscor Global Defense, Inc., | : |
| *Defendants.* | : |

**DECLARATION IN SUPPORT OF
DEFENDANTS ARMSCOR PRECISION INTERNATIONAL
& ARMSCOR GLOBAL DEFENSE, INC.'S
MOTION PURSUANT TO RULE 11(c) OF THE
FEDERAL RULES OF CIVIL PROCEDURE**

I, STEPHEN W. ANDERSON, under penalty of perjury, as specified in the laws of the State of Nevada, where this Declaration is made, the laws of the State of Kentucky, where this lawsuit was commenced, and the laws of the United States of America, as it is a District Court thereof before which this lawsuit is pending, declare as follows:

1. I am a duly elected Director of Defendant Armscor Precision International and the duly appointed Vice President for Claims Resolution for both Defendant Armscor Precision International (hereinafter API) and Defendant Armscor Global Defense, Inc. (hereinafter AGDI). I have, in various capacities since April of 1978, been actively involved in the investigation and resolution of the legal concerns of three generations of the family which controls, and has controlled, the majority ownership of those entities and their predecessors.

2. In my capacity as the Vice President for Claims Resolution, I developed and caused the implementation of the corporate policy governing the handling, investigation and resolution of product liability claims brought against either or both API and AGDI, within the United

1

States. That corporate policy directs officers and employees of both API and AGDI to promptly settle all valid product liability claims submitted, including such claims as are even only arguably valid, to patiently demonstrate to claimants exactly how their claim resulted solely from user error and not product defect, should that actually be the case, and to resist to the fullest extent all claims which are lacking any rational basis for potential liability of API and/or AGDI.

3. Also in my capacity as the Vice President for Claims Resolution, I am informed and believe that neither Plaintiff nor any agent of Plaintiff contacted either API or AGDI concerning any claim, prior to service of summons and complaint in this lawsuit.

4. As a result of my experience as the Vice President for Claims Resolution, my prior training and experience as a U.S. Army Military Policeman and Army Post Pistol Team competitor, and as a California Highway Patrol Officer, area office firearms instructor and CHP State Pistol Team competitor in local, state, regional and national level police pistol competitions, I have acquired expertise in the design, construction, functioning and adjustment of the internal mechanisms, and the proper, safe handling and use of Model 1911 A1 semiautomatic pistols. Based on my education, training and experience, as briefly related above, I wrote the Safety Precautions, a true copy of which is attached as an exhibit hereto and, by this reference, made a part hereof as if fully set forth here. I then caused that Safety Precautions page to be included in the printed User's Manual, which accompanies each and every Model 1911 A1 pistol shipped from the AGDI factory. From the text of Plaintiff's complaint in this lawsuit, I am informed and believe that such User's Manual is the same as the manual referenced in Paragraphs 20, 69 and 73 of Plaintiff's complaint.

5. I am informed and believe that, over the years since about 1990, AGDI and it's predecessor have produced and sold more than one million individual 1911 A1 type pistols,

worldwide. Out of that number, my staff and I have dealt with a relatively tiny number of product liability claims in which the claimants insisted that a 1911 A1 pistol, built by AGDI and imported by API, had discharged "all by itself, without anything or anyone touching the trigger." Our questioning of such claimants invariably disclosed that, after the pistol had been loaded, and a live, unfired cartridge had been cycled into the barrel's chamber, the user lowered the pistol's hammer to (what the user believed was) its half-cock position.

6. After experimenting a bit, by manipulating the hammer and trigger simultaneously, I was soon able to duplicate what is known in the applicable literature as a "false half-cock" situation, where the tip of the leading edge of the hammer's half-cock notch is precariously balanced on the tip of the sear, instead of the sear being captured entirely within the half-cock notch, as it should, such that the hammer can be caused to fall with enough remaining force to fire a chambered cartridge perhaps three times out of five tries, depending on the hardness of the primer cup in the cartridge.

7. The foregoing statements are true and correct of my own personal knowledge, except for those statements identified as being made on my information and belief, which I believe to be true and correct.

Executed under penalty of perjury, as set forth above, in the City of Pahrump, County of Nye, State of Nevada, on the 28 day of January, 2025, by

Stephen W. Anderson
Vice President for Claims Resolution
Armscor Global Defense, Inc., Armscor Precision International and Rock Island Armory U.S.A. Manufacturing, Inc.

3

# EXHIBIT 1

# 03 | SAFETY PRECAUTIONS

## CARRYING A LOADED 1911 PISTOL

Handling, carrying or otherwise transporting a 1911 pistol with an unfired cartridge in the chamber ALWAYS INCREASES THE RISK of an unintended firing of the cartridge, with the resulting potential for personal INJURY and DEATH. If you choose to assume that increased risk, and are not intending to fire the pistol immediately, always engage the manual thumb safety which blocks both the fully cocked hammer and the sear, a condition known as "cocked and locked." Do not, under any circumstances, carry or transport a 1911 pistol with an unfired cartridge in the chamber and the hammer set in the half-cock notch or lowered to the full forward position. Both of those hammer positions are so unsafe when carrying a 1911 pistol with a loaded chamber that they must never be used. Even the act of manually lowering the hammer into either of those positions with a loaded chamber is so unsafe that it must never be done.

## SAFETY FEATURES



**TRIGGER GUARD** - this is the metal loop around the trigger intended to deflect unwanted contact with the trigger and thereby help prevent unintended gun firing.



**GRIP SAFETY** - this safety blocks rearward movement of the trigger in order to prevent the gun firing unless the grip safety is first disengaged by the firm grasp of the shooting hand in normal shooting position, thereby allowing complete rearward trigger movement.



**THUMB SAFETY** - this is the manual safety located at the upper rear of the grip frame so the thumb of the shooting hand can be used to easily engage or disengage it, which can only happen when the hammer is fully cocked. When up and engaged, it blocks both the sear and hammer to prevent the gun firing. When engaged, this safety also blocks movement of the slide. The "cocked and locked" carry condition is achieved when the thumb safety is engaged.



**HALF-COCK NOTCH** - the half-cock notch in the hammer (often misleadingly called a safety notch) is intended to stop the hammer from reaching the firing pin in the unlikely event the full-cock notch fails to hold the hammer back. Should the hammer fall to the half-cock notch, the sear is then captured by the half-cock notch so that the sear can no longer be moved by the trigger until the malfunction is corrected. The half-cock notch IS NOT A SAFETY and must never be used as an alternative to engaging the thumb safety ("cocked and locked") when carrying the gun fully loaded.



**INERTIA FIRING PIN** - the firing pin, designed to be shorter than its housing, is held to the rear by a spring and is intended to hit a cartridge primer only when a sufficient hammer blow overcomes the spring force and the inertia of the firing pin.

**DISCONNECTOR** - this device interrupts the activation of the sear by the trigger in order to prevent the sear from releasing the hammer to fire a chambered cartridge until the slide and barrel are locked together and the trigger is released and pulled again.