UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| JEFFREY MADOR, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:24-cv-146-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| ARMSCOR PRECISION INTERNATIONAL, *also known as* API, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This is a product liability case. Plaintiff Jeffrey Mador filed a complaint against Defendants Armscor Precision International and Armscor Global Defenses, Inc. ("Defendants"), asserting various state law claims arising from injuries sustained from an unintended firearm discharge. *See* DE 1 (Complaint). Defendants now move for summary judgment on all of Mador's claims. *See* DE 64 (Motion). The motion is fully briefed and ripe for review. *See* DE 65 (Response); DE 66 (Reply). For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** DE 64. Ultimately, a jury must determine whether the M1911 A1 pistol at issue in this case was defective and unreasonably dangerous.

## I. Background

Mador purchased a Rock Island Armory M1911 A1 replica pistol from Selway Armory in Montana in November 2020. *See* DE 65-4 (Mador Deposition) at 24. Defendants manufactured the pistol. *See* DE 1 at ¶ 4. It was the first 1911-style firearm Mador had ever owned, *see* DE 65-4 at 22-23, and he was not familiar with the difference between a Series 70 model and other models, including Series 80 models, *see id.* at 26-27. After firing eight rounds on the day he purchased the

pistol, he never wittingly fired the pistol again. *See id.* at 30. Nevertheless, Mador performed monthly maintenance on the pistol by cleaning and oiling it and replacing the ammunition. *See id.* at 38.

Mador testified that he typically carried the pistol loaded, meaning with a live, unfired round in the chamber. *See id.* at 31-33. As opposed to carrying "cocked and locked," meaning with the hammer cocked back and the thumb safety engaged, he carried the pistol like his grandfathers and father taught him—with the "hammer down." *See id.* at 33-34. That is, Mador would load his eight-round magazine, put the magazine in the pistol, and pull the slide back, inserting a round from the magazine into the chamber. *See id.* at 54. He would then slowly lower the hammer down while pulling the trigger, preventing the pistol from discharging the chambered round while getting the hammer in the "fully forward" position. *See id.* at 55. He would then remove the magazine from the pistol, add an eighth round to the magazine to replace the chambered round, insert the magazine, and holster it. *See id.* Thus, the pistol contained nine unfired rounds—a live round in the chamber and eight rounds in the magazine. His pistol remained in this condition on a regular basis and, in his perception at least, on the night of the incident giving rise to this action.

The pistol came with a User's Manual. *See* DE 65-4 at 65; *see also* DE 64-6 (User's Manual). On the front page of the User's Manual, the user is instructed to "READ THE INSTRUCTIONS AND SAFETY PRECAUTIONS IN THIS MANUAL CAREFULLY BEFORE USING THE FIREARM." *See* DE 64-6 at 2. On the next page, the user is again instructed to carefully read and understand the contents of the manual before using the firearm. *See id.* at 3. A few pages later, in the Safety Precautions section, the Manual flags the need for full understanding

of the firearm's characteristics and warns against reliance on safety mechanisms to counter improper handling. Further, the precautions state:

> Handling, carrying or otherwise transporting a 1911 pistol with an unfired cartridge in the chamber ALWAYS INCREASES THE RISK of an unintended firing of the cartridge, with the resulting potential for personal INJURY and DEATH. If you choose to assume that increased risk, and are not intending to fire the pistol immediately, always engage the manual thumb safety which blocks both the fully cocked hammer and the sear, a condition known as "cocked and locked." Do not, under any circumstances, carry or transport a 1911 pistol with an unfired cartridge in the chamber and the hammer set in the half-cock notch or lowered to the full forward position. Both of those hammer positions are so unsafe when carrying a 1911 pistol with a loaded chamber that they must never be used. Even the act of manually lowering the hammer into either of those positions with a loaded chamber is so unsafe that it must never be done.

*Id.* at 7. Mador testified that he read and understood the Manual's contents, including the specific paragraph listed above. *See* DE 65-4 at 68-75. He admitted he did not follow the quoted precautions. *See id.* at 76-77.

On the morning of October 10, 2023, Mador returned home from his night shift at the Laurel County Correctional Center, where he worked as a corrections officer. *See id.* at 38-39. He brought the holstered pistol inside and placed it on the dining room table, where it remained for the rest of the day. *See id.* at 41. Before going to bed later that evening, Mador retrieved the holstered pistol and placed it in his bedside drawer, which was where he regularly stored it overnight. *See id.* at 45. When Mador closed the drawer, the pistol fired, shooting through the drawer and striking Mador in the leg with the discharged round. *See id.* Mador alleges he sustained severe injuries: "[t]he blood loss and severe damage to his leg required extensive emergency surgery. Multiple procedures and evaluations have followed, as Mr. Mador is left with permanent physical and psychological limitations and deficits." DE 1 at ¶ 17.

Mador initiated the present action on October 8, 2024, asserting claims of negligence, gross negligence, manufacturing defect, design defect, failure to warn, negligent misrepresentation, a

separate claim under the Product Liability Act of Kentucky, and two claims asserting vicarious liability. *See* DE 1.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a)–(c). If the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party," then the Court should grant summary judgment. *McGowan v. United States*, 143 F.4th 686, 695 (6th Cir. 2025) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986)). The moving party bears the initial burden of showing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009) ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party satisfies its burden, the burden shifts to the non-moving party to produce "specific facts" that suggest a "genuine issue" for trial. *See Celotex Corp.*, 106 S. Ct. at 2553. If the non-moving party cannot make a showing sufficient to establish the existence of an essential element of their case, then "Rule 56(c) mandates the entry of summary judgment." *Id.* at 2552.

In determining whether a genuine dispute of material fact exists, the Court construes all facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356; *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025). At this stage, the Court may not "weigh the evidence [or] determine the truth of the matter" in evaluating whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The substantive law governing the dispute dictates whether a fact is "material." *See id.* at 2510. That is, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" when "there is sufficient evidence favoring the [non-moving] party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 88 S. Ct. 1575, 1592 (1968)). Such evidence must be of a character that will be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 F. App'x 528, 444-45 (6th Cir. 2006).

Federal courts sitting in diversity apply federal law to resolve procedural issues and state law to resolve substantive issues. *See Hanna v. Plumer*, 85 S. Ct. 1136, 1141 (1965) (discussing *Erie R.R. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938)). A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *See Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 435 (6th Cir. 2017). Kentucky applies the "any significant contacts" choice-of-law test in tort actions. *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). Pursuant to that test, "any significant contact with Kentucky [is] sufficient to allow Kentucky law to be applied." *Bonnlander v. Leader Nat. Ins. Co.*, 949 S.W.2d 618, 620 (Ky. Ct. App. 1996). Both parties apply Kentucky substantive law in making their respective arguments. The Court therefore finds the "any significant contacts" test met and applies Kentucky law.

## III. Analysis

The Court has considered all arguments in the briefing, and it GRANTS in part and DENIES in part the summary judgment motion (DE 64).

This is a close case with narrow alleys of determinant analysis. What the Court gleans from the supported record is a gunmaker that, well apprised of its product's features and risks,

elected to make and sell the M1911 A1 pistol without implementing a long-available design modification that could have cured the particular ills presented—the risk of firing without a trigger pull. The firing pin safety had been known and available in the industry for many decades. Armscor instead opted for warnings. The warnings here, the Court must say, were largely effective. Plaintiff, the gun purchaser and person injured by the unintended discharge, actually read and digested all of the warnings given. What he did not do was follow the stated precautions; rather, he quite aggressively rejected the wisdom of the warnings and proceeded instead to handle the gun as his family had "trained" him to do through the years. On this record, had he followed the warnings he encountered, there would have been no discharge or injury.

Is that enough to absolve Armscor? The Court has wrestled with the issues but, under Kentucky law and the apt standards outlined below, answers in the negative. There is triable proof indicating that Armscor's product could feasibly have been made in a way that prevented the incident here. Whether the company's choice to forge ahead with the unmodified M1911 A1 pistol and rely on warning efficacy was reasonable plainly is a risk/utility decision for the jury to assess. A fair jury could determine that Armscor acted unreasonably in valuing the "replica" status and characteristics of the 1911 Model (with associated consumer choice issues and possible complications of modification) over the option of using a firing pin safety. In this case, the normal imputation of risk knowledge in strict product liability law is essentially superfluous. Armscor acknowledges its awareness and calculus, and the jury here must decide whether the product Armscor sold was defective and unreasonably dangerous.

And the warnings here too, which factor into the risk/utility rubric but offer a standalone claim, are ones the jury must assess. Although they cover much on risk communication, the warnings nowhere touch on what, as a supported position, is the key case and product issue—the

false half-cocked hammer position. Armscor employs many warnings over many aspects of the 1911 pistol, but Armscor never conveys that manipulation of the trigger may result in the gun being placed, inadvertently and imperceptibly, in the false half-cocked spot. That status implicates sharp and unwarned peril to the user and others because, the record shows, even a very shallow drop or light blow to the hammer can cause the firearm to discharge in that status. Armscor's representative agreed that a mere "touch" could release the hammer if in the false half-cocked perch. A reasonable juror could find that the warnings failed to impart that risk, the mechanism of injury threatened, and the type of risk exposure. Summary judgment would not be apt on these theories with this record.

**A. Design Defect Claims**

In Kentucky, product liability actions are, in some respects, governed by Kentucky's Product Liability Act ("KPLA"), KRS §§ 411.300-.350. Under the KPLA, a product liability action includes any action "brought for or on account of personal injury…caused by or resulting from the…design…of any product." KRS § 411.300(1). Mador brings his product liability claims under theories of negligence and strict liability, to include failure to warn.

To succeed on a negligence claim in Kentucky, the plaintiff must show that the defendant owed a duty of care to the plaintiff, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injury. *See Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992). Kentucky, which has adopted Section 402A of the Restatement (Second) of Torts for strict product liability cases, imposes strict liability on a product manufacturer "who sells any product in a defective condition unreasonably dangerous to the user" if the product causes physical harm to the user. *See Nichols v. Union Underwear Co., Inc.*, 602 S.W.2d 429, 431 (Ky. 1980); *Davidson v. Ford Motor Co.*, No. 6:21-cv-28-REW-HAI, 2023 WL 10554477, at *2-3

(E.D. Ky. Sept. 26, 2023). Both theories require the plaintiff to prove that the product was defective, typically meaning that it "does not meet the reasonable expectations of the ordinary consumer as to its safety" or "is not accompanied by adequate instructions and warning of the dangers attending its use." *Primal Vantage Co., Inc. v. O'Bryan*, 677 S.W.3d 228, 248 (Ky. 2022).

"A plaintiff in Kentucky can bring a defective design claim under either a theory of negligence or strict liability. The foundation of both theories is that the product is 'unreasonably dangerous.'" *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 535 (Ky. 2003) (quoting *Ulrich v. Kasco Abrasives Co.*, 532 S.W.2d 197, 200 (Ky. 1976)). The theories have distinct perspectives: "Whereas negligence examines the conduct of the manufacturer—could the manufacturer foresee the harm to the plaintiff and did the manufacturer act reasonably to prevent that harm—strict liability typically evaluates the condition of the product." *Id.* However, "under either theory, it is the legal duty of a manufacturer to use reasonable care to protect against foreseeable dangers." *Id.*

To determine whether the manufacturer exercised reasonable care in designing its product, Kentucky courts utilize a risk-utility analysis:

> A conscious decision to design a product in a certain manner necessitates that the focus be on conduct rather than the product. Hence, the trier of fact must employ a risk-utility balancing test that considers alternative safer designs and the accompanying risk pared [sic] against the risk and utility of the design chosen[.]

*Primal Vantage Co., Inc.*, 677 S.W.3d at 248 (citing *Ostendorf*, 122 S.W.2d at 535). Importantly, a question for the trier of fact exists, as to an alternative, where there is "evidence of probative value to support that there was 'an alternative safer design, practicable under the circumstances.'" *Id.* (quoting *Trent v. Ford Motor Corp.*, 2 F. Supp. 3d 1022, 1026 (W.D. Ky. 2014)).[1]

---

[1] Further:

> Considerations such as feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics, while they have a bearing on the question as to whether

"Under Kentucky products liability law, a warning is adequate if it conveys the product's underlying risk to a reasonable consumer." *Yonts v. Easton Tech. Prods., Inc.*, 676 F. App'x 413, 418 (6th Cir. 2017) (citing *Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 520 (Ky. 1968)). "The duty to warn extends to the dangers likely to result from foreseeable misuse of a product." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995) (citing *Post*, 437 S.W.2d at 521). In determining the sufficiency of the warning, the Court must consider the likelihood and seriousness of the risk involved. *See Yonts*, 676 F. App'x at 418 (citing *Edwards v. Hop Sin, Inc.*, 140 S.W.3d 13, 16 (Ky. Ct. App. 2003)).

Defendants argue they are entitled to summary judgment on the design claims because Mador failed to offer evidence of an alternative, safer design for the pistol.[2] *See* DE 64 at 14. In Defendants' view, the alternative design offered by Mador—incorporation of a firing pin safety—is not an alternative design and instead converts the 1911 Series 70 Model into a different product.[3] *See id.* The Court disagrees and finds that Mador has offered probative evidence supporting that

---

> the product was manufactured "in a defective condition unreasonably dangerous," are all factors bearing on the principal question rather than separate legal questions.

*Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 780–81 (Ky. 1984).

[2] Defendants passingly argue that Mador cannot establish causation because his decision to ignore product warnings and carry the pistol with a round in the chamber and the hammer fully forward constitutes a failure "to exercise ordinary care in the circumstances in his use of the product." *See* DE 64 at 24 (citing KRS 411.320(3)). Mador correctly notes that the Kentucky Supreme Court held that KRS 411.182 repealed the contributory negligence scheme of KRS 411.320(3). *See Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 474 (Ky. 2001). Thus, Defendants' reliance on KRS 411.320(3) is misplaced. Moreover, because legal causation typically "'presents a mixed question of law and fact,'" *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1223 (6th Cir. 2025) (quoting *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003)), whether Mador's injury was caused by Defendants' product "typically 'should be left to the jury to determine,[]'" *Id.* (quoting *Stathers v. Garrard Cnty. Bd. of Educ.*, 405 S.W.3d 473, 479 (Ky. Ct. App. 2012)). Therefore, the Court declines to grant summary judgment on causation grounds. Further, any presumption in the Act is of questionable applicability here, given debate over the state of the art. And any such presumption in practical ways is just a recognition that a plaintiff always bears the burden of proving a product defect.

[3] Defendants do not vigorously dispute the feasibility of incorporating a firing pin safety in their Series 70 model, the model of the relevant pistol. *See* DE 64 at 14. A similar model, the Series 80, offers such a safety.

there was an alternative safer design that was practicable under the circumstances such that there is question of fact for the jury. *See Primal Vantage Co., Inc.*, 677 S.W.3d at 248.

Mador's retained expert, Dr. Munsell, opined that the subject pistol design "retains the known hazards of unintended discharge due to impacts which are historically associated with this pistol, but fails to incorporate the proven safety measure that has effectively addressed them for over 40 years: the firing pin safety."[4] *See* DE 65-2 at 17-18. Munsell chronicled the safety feature's history, including industry discovery of the 1911 model's vulnerability in 1937 leading to the design change, the abandonment of the safety during World War II in the interest of production expediencies, and its re-incorporation into 1911 models in 1983 by Colt. *See id.* at 5. Further, Dr. Munsell explained that a firing pin safety could, like in other industry comparators such as Colt, Beretta, and Glock, be feasibly incorporated in Defendants' model. *See id.*[5] Munsell performed drop testing on an exemplar unit set in the false half-cocked hammer position, and the results were an unintentional discharge without a trigger pull from a height of 3.5" and 5". *See id.* at 17-18; *see also id.* at 14, 16 (also referencing mallet testing). Thus, Mador has offered evidence of a readily available fix that could have been implemented to render the pistol markedly less susceptible to inadvertent discharge without a trigger pull.

Defendants do not dispute a firing pin safety's efficacy in preventing unintentional discharges without a trigger pull or Armscor's deliberate choice to not incorporate it in its 1911 pistol design. *See* DE 65-3 at 50. The components that Defendants argue make the M1911 A1 pistol distinct from a design incorporating a firing pin safety, or that make its incorporation

[4] A firing pin safety permits the firing pin to move forward only when the trigger is pulled. *See* DE 65-2 at 5.

[5] Dr. Munsell claims that "firing pin safeties had been standard features in almost all semi-automatic handguns for decades" as of the pistol's manufacture date. *See* DE 65-2 at 5. However, the Court's review of the record does not reveal the pistol's manufacture date. Neither side presents that information.

infeasible or impracticable, are exactly what should be submitted to a jury to weigh as part of the risk-utility analysis. The functional and aesthetic features of the Series 70 model noted by Defendants, including a simpler, cleaner trigger pull, less complex trigger mechanism, and consumer preference for an *exact* 1911 pistol replica, must be weighed by the trier of fact as part of the risk-utility assessment. *See Primal Vantage Co., Inc.*, 677 S.W.3d at 248 (explaining that the risk-utility assessment considers the "risk and utility of the design chosen"). Similarly, any attendant risk created by incorporating a firing pin safety is itself an ingredient in the risk-utility assessment. *See id.* (explaining that the risk-utility assessment considers the "accompanying risk" of the alternative design). The jury may well agree with Defendants that Mador's proposed alternative design effectively transforms the Series 70 model into a distinct product and that the Series 70 is not defective, all things considered. But Mador has met his burden to justify putting the issue before a jury.

Moreover, certain adjacent factual disputes exist that must be sorted by the jury. Namely, Mador himself claims that the hammer was in the fully forward position when the firearm unintentionally discharged. *See* DE 64-1 at 50, 59-60. However, Mador's expert and Defendants' expert each opined that the shot more likely resulted from the false half-cocked position and Mador closing the drawer on the hammer. *See* DE 65-2 at 18; DE 65-3 at 24. The jury could find that the risk accompanying the determined position yielded the harm and analyze the claim from that standpoint. How the event occurred is a matter for the trier to determine.

As to the warnings, Mador confirmed that the pistol was accompanied with a User's Manual and that he read and understood the Manual, including the Statement of Liability and Safety Precautions. *See* DE 65-4 at 65, 68, 70-74. That Manual portion inarguably conveyed the general risk of an unintended discharge from carrying the pistol loaded with a chambered round.

*See* DE 64-6 at 7 ("Handling, carrying, or otherwise transporting a 1911 pistol with an unfired cartridge in the chamber ALWAYS INCREASES THE RISK of an unintended firing of the cartridge with the resulting potential for personal INJURY and DEATH."). It further warned of the general risk of carrying or transporting a 1911 pistol loaded with the hammer in the half-cocked or full forward position and of placing the hammer in such a position. *See id.* ("Do not, under any circumstances, carry or transport a 1911 pistol with an unfired cartridge in the chamber and the hammer set in the half-cock notch or lowered to the full forward position...Even the act of manually lowering the hammer into either of those positions with a loaded chamber is so unsafe that it must never be done."). Mador read and understood these warnings, and yet he quite intentionally and deliberately ignored them. *See* DE 65-4 at 76.

Nevertheless, the Court finds that Defendants are not entitled to summary judgment on Mador's failure to warn claim. The User's Manual's warnings make no reference to or in any way impart the false half-cocked positional possibility or risk, which Plaintiff's expert explains places the firearm in a position where "very slight impact" or "light pressure" on the hammer would cause discharge. *See* DE 65-2 at 5, 7. Lowering the hammer is warned against, but that may more readily go to the gun firing while the hammer is being lowered, not that it could be lowered to an ambiguous, unperceived, and precarious position making it vulnerable to the false half-cocked risk. The Manual also warns of carrying with the hammer half-cocked or fully forward, but it fails to mention the danger of the false half-cocked position, stating only that the hammer positions are "so unsafe…that they must never be used." DE 64-6 at 7. Again, a plaintiff may establish that a product is defective by showing inadequate warnings of the "dangers attending its use." *Primal Vantage Co., Inc.*, 677 S.W.3d at 248. The jury must evaluate whether the warnings communicated enough to render the product non-defective and whether the warnings sufficiently conveyed the

underlying risk. The false half-cocked position is one the consumer would not know about and likely would not perceive, and that status introduces, a jury could find, a radically sharper degree of risk as compared to the full forward or true half-cocked status.

Finally, Armscor representative Stephen Anderson testified about Defendants' knowledge of the risk and lack of warnings. This testimony contributes to summary judgment denial. He acknowledges "that a false half-cock position is a known hazard" in the 1911 Series 70 models. *See* DE 65-3 at 39-40. He agrees that Armscor was aware of the false half-cock possibility for several decades. *See id.* at 151-52.[6] He acknowledges Armscor should have warned Mador of the possibility. *See id.* at 42 ("Q: Wouldn't you agree that Armscor should have warned Mr. Mador about the hidden false half-cock condition in the owner's manual? A: Yes."). He claims, generally, that the textual precautions inferentially did that, but he agrees the text does not include the specific risk. *See id.* at 42-43. He repeatedly conceded that a warning about the "false half-cock position" is not in the manual. *See id.* at 26 ("correct"), 27 (as to warning, "there is none"), 148 ("Q: False half cock ain't in the manual, Mr. Anderson. A: I'll admit it."). Simply put, a reasonable jury could determine that Armscor knew of the positional risk and unreasonably omitted any reference to that risk in the product warnings. That creates a jury question relative to a failure to warn.

Part of it is the plain issue that a consumer manipulating the hammer would not know that he has created (even, could create) the dangerous false half-cocked status. As Anderson stated in his prior affidavit, DE 24-1 ¶¶ 5-6, Armscor knows that prior unintended discharges came "invariably" from this risk. He avers that, typically, the true status of the unintentionally fired pistol has proven to be the false half-cocked, not true half-cocked status, contra to "what the user believed" was in place. Anderson said with this status, the hammer "precariously balanced" on

[6] The prior notices contribute here. Anderson testified to up to 70 untriggered discharge events, and he described the majority as related to the false half-cock issue. *See* DE 65-3 at 149.

the tip of the sear, the hammer can be caused to fall and thus fire 60% of the time. *See id.* ¶ 6. In his deposition, he agreed that "simply touching it" could cause the hammer to fall. DE 65-3 at 23. Although Armscor warned against reliance on the true half-cock notch and against hammer manipulation with a round loaded, the high vulnerability of the foreseeable false half-cocked hazard is omitted, indeed intentionally eschewed, as a warning topic. That, a jury must sift.[7]

Defendants also move for summary judgment on Mador's gross negligence claim (Count Two). *See* DE 64 at 16-17. Under Kentucky law, punitive damages may be awarded only if a plaintiff proves "by clear and convincing evidence that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud, or malice." KRS 411.184(2). However, the Kentucky Supreme Court has explained that a plaintiff may succeed on a gross negligence claim, entitling the plaintiff to punitive damages, if the plaintiff proves the elements of an ordinary negligence claim and that the negligence was accompanied by "wanton or reckless disregard for the lives, safety, or property of others." *See Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013).

On the one hand, Defendants did take steps to effectively communicate the general discharge risk and an avoidance protocol, and Plaintiff faces the clear and convincing burden of KRS 411.184(2). However, Defendants also eschewed a physical change that would have eliminated the need to rely only on warnings. Defendants also knew the long-standing risk from

[7] And just a remark or two about *Sturm, Ruger & Co. v. Bloyd*, 586 S.W.2d 19, 22 (Ky. 1979), cited by Defendants in reply. That case has some facile parallels to this one but also some telling differences. True, the Court assessed a replica-type firearm and exonerated the maker. However, *Sturm, Ruger & Co.* arose before Kentucky's 1988 statutory adoption of comparative fault. Further, the case did not account for the maker's obligation to guard against (at least warn against) foreseeable misuse, which now is a product liability fixture under Kentucky law. *See Morales*, 71 F.3d at 537. And, the Court notes, the "Exact Replica" theory is not one the law has enshrined, per the Court's research. It's difficult to believe *Sturm, Ruger & Co.* would receive the same analysis or produce the same result under current law.

the false half-cocked position, and they have encountered up to 70 instances of unintended discharge, mostly based on that peril. *See* DE 65-3 at 149. Despite that, Armscor has not pivoted to a more inclusive warning. Anderson described how easily he could recreate the problem and demonstrate its result, an unintended hammer fall. *See* DE 24-1 ¶¶ 5-6. Notably, Armscor cites potential problems with installing a firing pin safety, but the Company has never done a safety evaluation to determine whether implementing the firing pin safety would make the 1911 pistol safer. *See* DE 65-3 at 155. And as noted in the defect analysis, Defendants' warnings do not touch on, address, or communicate the particular eventuality and risk that likely ripened. Nothing in the materials would have alerted a user to the potential for placing the gun in the precarious status of the false half-cocked alignment, where a mere touch to the hammer could fire the weapon. A jury may well reject any characterization of defect or may, at a second juncture, reject any characterization of recklessness. However, a jury could reasonably make counter findings at each step, and the Court entrusts the matter to the fact-finder. Arguable defect notice, a forgone remedy, and particular instances of dangerous product performance, yet no alternative safety testing, all cut in favor of a triable issue on punitive damages. *See Scanlon v. Sunbeam Prods., Inc.*, No. 3:12-CV-00009-CRS, 2018 WL 2392549, at *4-5 (W.D. Ky. May 25, 2018) (distinguishing *Sufix U.S.A., Inc. v. Cook*, 128 S.W.3d 838 (Ky. Ct. App. 2004), a case with "evidence that the manufacturer failed to perform sufficient product testing, and that the manufacturer was made aware of the safety risks posed" by the product, in granting summary judgment on plaintiff's claim for punitive damages).

**B. Vicarious Liability**

Counts Eight and Nine seek to hold Defendant Armscor Global Defenses, Inc. vicariously liable for the acts of Defendant Armscor Precision International. *See* DE 1 at 17-18. Defendants'

ground for dismissing these derivative claims hinged on the Court disposing of the substantive claims. Because certain claims survive, the Court denies summary judgment on Counts Eight and Nine.

**C. Abandoned Claims**

Mador indicates that he completely abandons his manufacturing defect claim (Count Three) and his negligent misrepresentation claim (Count Six). *See* DE 65 at 15, 18. Recognizing that Kentucky's Product Liability Act does not create an independent cause of action, Mador also abandons Count Seven, insofar as it is read as a discrete claim. *See id.* at 18-19. Therefore, the Court GRANTS DE 64 as to Counts Three, Six, and Seven.

## IV. Conclusion

For the foregoing reasons, and the Court being otherwise sufficiently advised, ORDERS as follows:

1) The Court **GRANTS** DE 64 as to Plaintiff's Counts Three, Six, and Seven;
2) The Court **DENIES** DE 64 as to Plaintiff's Counts One, Two, Four, Five, Eight, and Nine;
3) By No later than 14 days from this order, the parties shall file a joint status report setting forth the following: a) anticipated length of trial; b) dates of availability for trial in the first half of 2027; and c) whether the parties intend to engage in mediation and, relatedly, whether the parties would have interest in mediation by the Magistrate Judge.

This the 25th day of August, 2026.

**Signed By:**
***Robert E. Wier*** REW
**United States District Judge**